AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Connecticut

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Samsung smart phone, IMSI: 310260071226404 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 19MJ665 (HBF)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated by reference

located in the _____ District of _____ Connecticut _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), | Conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. |

The application is based on these facts:
See Affidavit of DEA TFO John Binkowski

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

John Binkowski DEA TFO
*Printed name and title*

Sworn to before me and signed in my presence.

/s/

Date: _____04/22/2019_____

*Judge's signature*

City and state: Bridgeport, Connecticut

Holly B. Fitzsimmons, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

19 M J 665 (HBF)

STATE OF CONNECTICUT

COUNTY OF FAIRFIELD

ss:     Bridgeport

**AFFIDAVIT**

I.     **Introduction**

I, John Binkowski, being first duly sworn, hereby depose and state as follows:

1.   I have been employed as a Police Officer with the Milford Police Department since
August 2013.  I am currently a sworn and deputized Task Force Officer with the U.S. Drug
Enforcement Administration ("DEA"). I have been a DEA Task Force Officer since January
2017. I am currently assigned to the Bridgeport High Intensity Drug Trafficking Area Task Force
("DEA Task Force"), which is comprised of personnel from the DEA, Connecticut State Police,
Bridgeport Police Department, Norwalk Police Department, Stamford Police Department,
Stratford Police Department, and Milford Police Department.

2.   During the course of my career, I have participated in numerous criminal investigations
including investigations into suspected narcotics trafficking and money laundering.  My
participation in the investigations has included coordinating controlled purchases of narcotics
utilizing confidential informants, cooperating witnesses, and undercover law enforcement
officers; coordinating the execution of search and arrest warrants; conducting electronic and
physical surveillance; analyzing records related to narcotics trafficking; testifying in Grand Jury
and District Court proceedings; and interviewing individuals and other members of law
enforcement regarding the manner in which narcotics traffickers obtain, finance, store,
manufacture, transport and distribute controlled substances.  Finally, I have participated in

multiple investigations involving the use of court-authorized interception of wire and electronic communications

3.   I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I am the co-case agent on the investigation which is the subject of this affidavit and have personally participated in the investigation concerning violations of the federal laws listed herein.

4.   The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, task force officers and witnesses. I have personally participated in this investigation and am familiar with the facts and circumstances of the offense described. Information developed on this investigation has been through physical surveillance and information provided by confidential informants and cooperating witness; analysis of telephone call detail records and telephonic subscriber information; and review of Connecticut Department of Motor vehicle records.  The statements contained in this affidavit are based on, in part, on my personal knowledge.

This affidavit is submitted in support of warrants to search the following cellular telephones, which were seized from Desny Sosa-Hernandez and Edgard Benejam-Martinez on March 28, 2019 in Waterbury, CT. These cellular phones were seized by the DEA and are currently in the custody of DEA Bridgeport. These cellular telephones are described as:

     a.   **Target Device 1:** Samsung smart phone, which utilized number (646) 339-5738; IMSI: 310260955885764; which is currently in DEA custody.

     b.   **Target Device 2:** Samsung smart phone, which utilized number (475) 449-4333; IMSI: 310260071226404; which is currently in DEA custody.

c. **Target Device 3:** Samsung smart phone, which utilized number (939) 240-2295; IMSI: 310260876919061; which is currently in DEA custody.

5.     The warrants in support of which this affidavit is submitted would authorize the forensic examination of the Target Devices for the purposes of identifying electronically stored information particularly described herein and in the attachment hereto.  This affidavit does not purport to set forth all of the facts gathered during the course of the investigation of this matter. Rather, this affidavit includes only those facts which are necessary to establish probable cause to support the issuance of the requested warrant.

<u>**Probable Cause**</u>

6.   In September 2018, DEA members identified Desny Sosa-Hernandez and Edgard Martinez as personally bringing cocaine to Bridgeport, Connecticut for the purpose of redistribution.  Based upon information developed during the course of this ongoing investigation, there is probable cause to believe that Sosa-Hernandez and Edgard Benejam-Martinez used Target Devices 1, 2 and 3 to contact customers and aid in the sale of narcotics. That belief is based on information from confidential sources, physical surveillance, call-detail records and other information

7.   On December 3, 2018, DEA members conducted physical surveillance of Sosa-Hernandez and Martinez in Waterbury, CT and Bronx NY.

8.     At approximately 9:22 a.m., DEA members observed Vehicle #1 (the vehicle was later in an accident) arrive at Sosa-Hernandez's residence located at 150 Manhan St., Waterbury, CT (hereinafter "**Sosa-Hernandez's residence**").  DEA members observed Martinez operating Vehicle #1.  A short time later, DEA members observed Sosa-Hernandez leave **Sosa-Hernandez's residence** and enter into Vehicle #1.  Although DEA members could not hear the

conversation, DEA members observed what appeared to be Sosa-Hernandez and Martinez speaking to each other inside Vehicle #1.  A short time later, Sosa-Hernandez exited Vehicle #1 and entered an Acura sedan bearing New York Registration #JAJ4155 that is registered to Sosa-Hernandez.  Moments later, DEA members observed an unknown female exit **Sosa-Hernandez's residence** and Martinez enter the Acura and depart the area.  DEA members attempted to maintain mobile surveillance on the Acura but were unable to locate the vehicle after it left the parking lot.

9.  At approximately 10:10 am, DEA members observed the Acura arrive back at Sosa-Hernandez's residence with the same three occupants.  Moments later, DEA members observed Sosa-Hernandez and Martinez exit the secondary vehicle and enter Vehicle #1 and immediately depart the area.   DEA members observed Martinez operating Vehicle #1.

10. DEA members maintained surveillance on Vehicle #1 and observed Vehicle #1 stop at the Shell gas station, located at 618 W Main St Waterbury.  DEA members saw Martinez exit Vehicle #1 and scan the area.  Martinez proceeded to put gas in Vehicle #1 as he (Martinez) continued to scan the area.  Vehicle #1 departed the Shell gas station and entered onto Rt. 8 southbound and then onto 95 southbound.  DEA members observed Vehicle #1 exit 95 southbound into the Fairfield rest stop.  DEA members observed both Sosa-Hernandez and Martinez exit Vehicle #1 and scan the area and then enter the rest stop. Moments later, DEA members observed both Sosa-Hernandez and Martinez exit the rest stop carrying a bag and enter Vehicle #1.  DEA members observed Vehicle #1 enter 95 southbound.  DEA members maintained mobile surveillance on Vehicle #1 as it travelled on 95 southbound at very slow speeds and at times a high rate of speed.  During the course of the mobile surveillance, numerous DEA Bridgeport members had to pass Vehicle #1 due to Vehicle #1's slow rate of speed.  DEA

Bridgeport members observed Vehicle #1 exit Interstate 95 at White Plains Rd Bronx, NY.

11. At approximately 11:59 am., DEA members observed Vehicle #1 on West Ave Bronx, NY. Moments later, DEA members observed Sosa-Hernandez and Martinez exit Vehicle #1 and enter the business PostNet (1451 West Ave Suit I-2 Bronx, NY).  A short time later, DEA Bridgeport members observed Sosa-Hernandez and Martinez exit the PostNet and depart the area on foot.

12. At approximately 2:05 pm., DEA Bridgeport members observed Martinez enter the PostNet.  A short time later, DEA Bridgeport members observed Martinez exit PostNet holding a white medium sized United States Postal package and immediately re-entered Vehicle #1. Vehicle #1 immediately went mobile and DEA Bridgeport members began conducting mobile surveillance on Vehicle #1 as it eventually entered I-95 northbound.

13.  DEA Bridgeport members maintained mobile surveillance on Vehicle #1 as it accelerated at a high rate speed on I-95.   DEA Bridgeport members attempted to maintain visual surveillance on Vehicle #1 as it continued to travel at a high rate of speed on I-95. Other  DEA Bridgeport members went to **Sosa-Hernandez's residence**. At approximately 4:02 pm., DEA Bridgeport members observed Vehicle #1 arrive and park outside of Building 1 Unit 7. DEA Bridgeport members observed both Sosa-Hernandez and Martinez outside of the vehicle. Moments later, DEA Bridgeport members observed a medium sized package covered in wrapping paper being placed on the roof of Vehicle #1. DEA Bridgeport members believe the package size was consistent with the size of the United States Postal package, which was observed earlier in Bronx, NY.  The package appeared wrapped poorly due to the excess wrapping blowing in the wind. DEA Bridgeport members observed Sosa-Hernandez and Martinez enter Sosa-Hernandez's residence with the package.

14. A short time later, DEA Bridgeport members observed Martinez exit Sosa-Hernandez's residence carrying a lunchbox sized neoprene style bag in his left hand and enter the driver-side of Vehicle #1. Moments later, Vehicle #1 departed the area. DEA Bridgeport members continued surveillance on Vehicle #1 as it traveled onto Interstate 84 Eastbound toward Hartford.  DEA Bridgeport members observed Vehicle #1 once again accelerate at a high rate of speed so surveillance was terminated based on Vehicle #1s speed.

15. Based on my training and experience, and participation in this investigation, I believe that Sosa-Hernandez and Martinez were utilizing counter surveillance techniques by pulling into multiple gas stations in a short period.  I also believe based on my training and experience, Sosa-Hernandez and Martinez were utilizing counter surveillance techniques as they were operating Vehicle #1 on I-95 at very low and high rates of speed in attempt to identify any/all law enforcement personnel.  Based on my training and experience and participation in this investigation, and because Sosa-Hernandez's and Martinez's use of counter-surveillance tactics once they picked up the package from New York, I believe that the package that was taken into **Sosa-Hernandez's residence** contained controlled substances.

16. On January 11, 2019, DEA members conducted physical surveillance of Martinez's residence, 86 Buff Cap Rd Apartment A4, Tolland, CT (hereinafter **"Martinez's residence"**). DEA members observed an Unidentified Male (UM) walking into Apartment A4. DEA members observed SOSA-HERNANDEZ's Mazda mini-van bearing New York Registration #HXW1283, which is regularly utilized by Martinez, parked outside of Apartment A4 occupied by a single occupant believed to be Martinez. DEA members had followed Martinez to this location on previous occasions when he has operated Sosa-Hernandez's Mazda mini-van bearing New York Registration #HXW1283.  DEA members observed the UM exit Apartment A4 and enter the

passenger-side of the Mazda mini-van. DEA members observed the Mazda mini-van back out of the parking-space and leave the area.

17. On January 28, 2019, DEA members conducted physical surveillance of **Sosa-Hernandez's residence**. DEA members observed Vehicle #1, pull into the apartment complex 150 Manhan St Building 1 and park directly next to Sosa-Hernandez's Acura sedan. DEA members observed Martinez exit the driver-side and Sosa-Hernandez exit the passenger-side of the Mazda mini-van. DEA members observed both Sosa-Hernandez and Martinez walk directly into **Sosa-Hernandez's residence**. A short time later, DEA members observed Martinez exit **Sosa-Hernandez's residence**, re-enter the driver-side of Vehicle #1 and exit the apartment complex.

18. On February 7, 2019, DEA members conducted physical surveillance of Sosa-Hernandez's residence, **Sosa-Hernandez's residence**. DEA members observed Apartment 1's door open. DEA members observed Sosa-Hernandez standing inside the open doorway of Apartment 1. Sosa-Hernandez appeared to be speaking into his cell phone. DEA members observed Sosa-Hernandez re-enter **Sosa-Hernandez's residence**.

19. On March 4, 2019, DEA members arranged and oversaw a controlled purchase of cocaine from Sosa-Hernandez and Martinez with the assistance of a Cooperating Witness (the "CW"). The CW has been cooperating with the DEA since December 2018 and has provided information that has been corroborated and has proven reliable.[1]

---

[1] The CW has prior criminal convictions, including: has prior State criminal convictions for: (a) criminal possession controlled substance; (b) Possession Forged Instrument; (c) Criminal Possession Stolen; (d) Criminal Possession Weapon-4th: Firearm/Weapon; (e) Petit Larceny; (f) Possession Stolen Credit card; (g) Possession Forged Instrument; (h) Tampering With Physical Evidence: Conceal/Destroy; (i) Grand Larceny-4th: Credit Card; (j) Possession Forged Instrument-2nd Degree; (k) Parole Admission Reason: Initial Release to Parole; (l) Possession Forged Instrument-2nd Degree; (m) Forgery 2nd: Deed, Will Codicil, Contract (n) Possession

20. Prior to the meeting, the CW spoke to Martinez in a conversation that DEA listened to via a kel transmitter. Based on the kel recordings of Martinez's call, Martinez informed the CW that Martinez would not be travelling to the greater Bridgeport area and that Sosa-Hernandez would be travelling solo to meet the CW and consummate the narcotics transaction.

21. Agents met with the CW at a predetermined pre-buy meet location, where they searched the CW for money or contraband with negative results. Agents provided the CW with DEA Official Advanced Funds to make the controlled purchase of cocaine. The CW stated that Martinez told him to meet Sosa-Hernandez at public facility within the greater Bridgeport area. In anticipation of the controlled purchase of cocaine, DEA members established surveillance at **Sosa-Hernandez's residence** and at **Martinez's residence**.

22. At approximately 4:35 pm., DEA members observed Sosa-Hernandez's Acura Sedan bearing New York registration JAJ-4155 arrive in the area of **Martinez's residence** and park directly in front of Building A. Apt. A4. Moments later, DEA members saw Martinez exit the front passenger seat of Sosa-Hernandez's Acura and enter **Martinez's residence**. After a very brief period, Martinez left **Martinez's residence** clutching his jacket and re-entered the front passenger side of the Sosa-Hernandez's vehicle. DEA members then observed Martinez exit Sosa-Hernandez's vehicle holding a small white lunch-box type bag and re-enter **Martinez's residence**. After a brief period, Martinez again left **Martinez's residence** and leaned into the passenger side of the vehicle. Moments later, DEA members observed Martinez walk to the rear

---

Forged Instrument-2[nd] degree; (o) Grand Larceny 4th: Value Property Greater Than $1000 (p) Criminal Possession Stolen Property; (q) Criminal Possession Stolen Property-4[th]: Property Value Exceeds $1000; (r) Possession Forged Insstrument-2[nd] degree; (s) Forgery-2[nd]: Deed, Will, Codicil, Contract Credit card (t) Forgery-2[nd]; (u) Possession Forged Instrument-2[nd] degree; (v) Possession Forged Instrument-2[nd] degree; (w) Bail jumping-2[nd] degree; (x) Possession Forged Instrument -2[nd] degree; (y) Crime involving Moral Turpitude Committed within 5 years; and (z) illegal reentry.

off Sosa-Hernandez's vehicle and place something in the trunk. DEA members observed Martinez reenter **Martinez's residence** and Sosa-Hernandez departed the area. Law enforcement members maintained constant mobile surveillance on Sosa-Hernandez's vehicle until Sosa-Hernandez arrived in the greater Bridgeport area.

23. Based on my training and experience, and participation in this case, I believe that Sosa-Hernandez and Martinez travelled together to **Martinez's residence** and Martinez entered **Martinez's residence** to retrieve narcotics to give to Sosa-Hernandez because had spoken to the CW to discuss the cocaine purchase, was not going to Bridgeport.  Based on my training and experience, I believe when Martinez exited **Martinez's residence**, clutching his side, Martinez was carrying narcotics from **Martinez's residence** to give to Sosa-Hernandez for distribution to the CW.  I believe when Martinez returned to Sosa-Hernandez's vehicle that Martinez placed the narcotics inside Sosa-Hernandez's vehicle since Martinez would not be travelling to the greater Bridgeport area with Sosa-Hernandez.  That Sosa-Hernandez drove directly from **Martinez's residence** to the narcotics sale is further evidence that Martinez retrieved narcotics for the sale from **Martinez's residence**.

24. At approximately 5:53 P.M., Agents observed Sosa-Hernandez's Acura arrive in the area of the predetermined location to meet the CW in Bridgeport, CT.  Moments later, Agents observed the CW meet with Sosa-Hernandez.  At approximately 6:03 P.M., the CW left from Sosa-Hernandez's Acura and the Acura drove away from the area. Law enforcement members maintained constant mobile surveillance on Sosa-Hernandez's Acura.  At approximately 6:10 P.M., Agents observed Sosa-Hernandez park in the vicinity of 80 Oakwood St., Bridgeport, CT.  Moments later, Agents observed Sosa-Hernandez enter 80 Oakwood St., Bridgeport, CT.

25. Based on my knowledge of the case and participation in the investigation, agents have identified 80 Oakwood St., Bridgeport, CT, which is at the end of a dead-end street, as a location associated with Deoracio Cruz, a drug addict and mechanic.  On numerous occasions throughout the investigation, agents have observed Cruz performing mechanical work on numerous vehicles, including Sosa-Hernandez's vehicle, outside of 80 Oakwood St.  DEA interactions with at least one resident of 80 Oakwood Street reveals that Cruz does not have a permanent residence due to his addiction to narcotics and the residents at 80 Oakwood St. allow Cruz to visit 80 Oakwood St. so Cruz can work on vehicles outside the residence.  Based on my knowledge of the investigation, I believe Sosa-Hernandez and Martinez do not store any narcotic proceeds or narcotics at 80 Oakwood St. due to Cruz's drug addiction, but rather use the dead-end location as a further narcotics distribution point.

26.  At approximately 6:53 P.M., Agents observed Sosa-Hernandez arrive in the area of **Sosa-Hernandez's residence**.  Moments later, Agents saw Sosa-Hernandez exit his vehicle while talking on his cellular telephone. Agents watched as Sosa-Hernandez walked up the ramp and entered **Sosa-Hernandez's residence**.  Based on my training and experience, and Sosa-Hernandez's drive from 80 Oakwood Street to **Sosa-Hernandez's residence**, I believe that Sosa-Hernandez stores narcotics sale proceeds at **Sosa-Hernandez's residence**.

27. After meeting with Sosa-Hernandez, the CW met with agents at a predetermined location. The CW turned over approximately 10 grams of a white rock like substance which field tested positive for cocaine. Agents searched the CW for contraband and monies with negative results. Based on my training, experience, and knowledge of this investigation, I believe Sosa-Hernandez traveled to the greater Bridgeport area to conduct narcotic transactions with the CW and other narcotic identified traffickers.  Per kel recordings, Sosa-Hernandez began to discuss his (Sosa-

Hernandez)drug trafficking operation, including the sale of cocaine and heroin, with the CW.

Sosa-Hernandez told the CW in substance that he receives product (narcotics) both in

Connecticut and New York. Sosa-Hernandez further explained to the CW that he (Sosa-

Hernandez) can sell kilogram quantities of cocaine or, alternatively, he (Sosa-Hernandez) could

break the cocaine down to 50 grams upwards to 500 grams.  Per kel recordings, Sosa-Hernandez

explained to the CW that he (Sosa-Hernandez) was waiting to get a price for the heroin. Sosa-

Hernandez provided the CW with Target Device 1 to arrange future narcotics transactions

28. On March 11, 2019, DEA members arranged and oversaw a controlled purchase of

cocaine from Sosa-Hernandez and Martinez.  Agents met with the CW at a predetermined

meeting location, where they searched the CW for money or contraband with negative results.

Agents directed CW to contact Sosa-Hernandez and Martinez via Target Device 1 to arrange the

controlled purchase of cocaine.  Agents provided the CW with DEA Official Advanced Funds to

make the controlled purchase of cocaine.  The CW stated that Martinez told the CW to meet

Sosa-Hernandez and Martinez at a public facility within the greater Bridgeport area.  In

anticipation of the controlled purchase of cocaine, Agents established surveillance at **Sosa-**

**Hernandez's residence** and at **Martinez's residence**.

29. At approximately 4:21 pm., DEA members observed Sosa-Hernandez exit **Sosa-**

**Hernandez's residence** and meet with an unidentified male (UM) in the parking lot; agents had

been watching the location since 2:45 p.m.  DEA members observed Sosa-Hernandez and the

UM attempting to extract an object from the rear hatch of the UM's vehicle.  Agents observed

Sosa-Hernandez and the UM take off the inner plastic cover of the hatchback.  Agents observed

Sosa-Hernandez and UM then walk to the front of the UM's vehicle.  Agents then observed

Sosa-Hernandez and the UM place the inner plastic back on the hatchback.  A short time later,

Agents observed Martinez arrive in the area of **Sosa-Hernandez's residence** operating a green Mazda MP-V bearing New York registration HXW-1283.

30. Agents then observed Martinez exit the driver-side of the Mazda MP-V holding a medium sized package or box. Agents observed Martinez speaking with Sosa-Hernandez near the front of the Acura sedan and observed Martinez look at the box or package he was holding and make a subtle gesture like he was showing Sosa-Hernandez the box or package**.** DEA members observed Martinez looking around the immediate area, while speaking with Sosa-Hernandez. Moments later, Agents observed Sosa-Hernandez carrying a red tool box and Martinez carrying a white package or box enter **Sosa-Hernandez's residence**. At approximately 5:15 pm, agents observed Martinez exit **Sosa-Hernandez's residence** empty handed.  DEA members observed Sosa-Hernandez exit **Sosa-Hernandez's residence,** who appeared to be clutching or holding an unknown item in his right hand or against his right hip. DEA members observed Sosa-Hernandez's right arm appeared to be stiff, while his left arm swung in a natural motion. DEA members saw both Martinez and Sosa-Hernandez enter the Mazda MP-V. A short time later, agents observed Sosa-Hernandez, Martinez, and the UM depart the area.  DEA members maintained mobile surveillance on Sosa-Hernandez and Martinez.

31. At approximately 5:59 pm., agents observed Sosa-Hernandez and Martinez arrive in the area of the predetermined meet location. Kel recordings indicated the CW contacted Martinez via Target Device 1 and Martinez directed the CW to Sosa-Hernandez and Martinez's location. Moments later, agents observed the CW meet with Sosa-Hernandez and Martinez at the specified location.  At approximately 6:10 pm., agents observed the CW depart from Sosa-Hernandez and Martinez.  Moments later, agents observed Sosa-Hernandez and Martinez depart the area.

32. DEA members observed Sosa-Hernandez and Martinez arrive at 80 Oakwood St., Bridgeport. As stated previously in the affidavit, agents have identified 80 Oakwood St., as a location where Sosa-Hernandez and Martinez meet additional cocaine customers, as well as have mechanical work performed on their motor vehicles. A short time later, agents saw Cruz working on the interior of Sosa-Hernandez's vehicle while Sosa-Hernandez and Martinez attempted to assist Cruz. Based on my training and experience and participation in this investigation, I believe the Mazda MP-V was having mechanical issues due to a recent motor vehicle accident, where the vehicle sustained substantial rear passenger-side damage.

33. Around 7:35 p.m., DEA members observed Sosa-Hernandez and Martinez depart the area of 80 Oakwood St. DEA members maintained mobile surveillance on Sosa-Hernandez and Martinez. DEA members observed Sosa-Hernandez and Martinez travel Northbound on Route 8.

34. At approximately 8:40 pm., DEA members observed Sosa-Hernandez and Martinez arrive in the area of **Sosa-Hernandez's residence**. Moments later, DEA members observed Sosa-Hernandez exit the vehicle and enter **Sosa-Hernandez's residence**. Moments later, DEA members observed Martinez depart the area and agents maintained mobile surveillance.

35. At approximately 9:34 P.M., DEA members observed Martinez arrive in the area of **Martinez's residence**. Moments later, DEA members observed Martinez exit his vehicle, while holding a weighted down bag and enter **Martinez's residence**.

36. Based on my training and experience, and knowledge of the investigation and physical surveillance of Sosa-Hernandez and Martinez, I believe Sosa-Hernandez and Martinez travelled back to Sosa-Hernandez's residence and Martinez's residence with narcotic proceeds after distributing narcotics to the CW. I believe the bag Martinez carried into Martinez's residence

contained proceeds from the sale of narcotics.

37. After meeting with Sosa-Hernandez and Martinez, the CW met with DEA members at a predetermined location. The CW turned over approximately 50 grams of a white rock like substance, which field-tested positive for cocaine. Agents searched the CW for contraband and money with negative results.

38. A review of kel recordings of conversations between the CW and Martinez, and the CW's own information, Martinez told the CW that he (Martinez) always had cocaine available. When, as per agent instruction, the CW informed Martinez that he/she was interested in purchasing 500 grams of cocaine. Martinez informed the CW that he (Martinez) could give the CW a better price since the CW wanted to purchase 500 grams or more. According to the CW, Martinez told the CW that the price per gram would drop by one dollar. Per kel recordings, Martinez also told the CW that he (Martinez) has marijuana available to sell for $1,000 dollars per pound. Per kel recordings, Martinez informed the CW that he (Martinez) would have a price per gram of heroin in a couple days and provide the CW with a sample.

39. Based on my training, experience, and knowledge of this investigation, I believe Sosa-Hernandez and Martinez traveled to the greater Bridgeport area to conduct narcotic transactions with the CW and other identified narcotics distributors.

40. March 21, 2019, the Hon. William I. Garfinkel, USMJ, authorized federal search warrants for **Sosa-Hernandez's residence** and **Martinez's residence**.

41. On March 28, 2019, the CW spoke to Martinez via Target Device 1 and arranged to purchase 300 grams of cocaine. Martinez had previously explained that he and Sosa-Hernandez would have the 500 grams requested only after they sold the 300 grams they had left over from their last resupply of cocaine.

42. In anticipation of the sale, DEA members set up surveillance teams at **Sosa-Hernandez's residence** and **Martinez's residence**

43. On March 28, 2019, DEA members saw Martinez arrive at **Martinez's residence** in his Mazda minivan. Martinez entered **Martinez's residence**, and then he walked out of the residence a minute later and re-entered the minivan. Martinez was holding a rolled up brown paper bag that appeared to be weighted down when he got into the minivan. Based on my training and experience, the size and condition of the brown paper bag, as well as the information outlined above, I believe the brown paper bag in Martinez's hand was consistent with packaging of approximately 300 grams of cocaine.

44. Martinez then left his residence in the Mazda minivan and headed towards Waterbury on interstate 84. DEA members followed Martinez and kept him under constant surveillance.

45. DEA members saw Martinez stop at a gas station off exit 68 of interstate 84. Martinez got out of his vehicle, went inside for a brief period, and returned to his minivan a few moments later to pump gas. DEA members had Martinez under constant surveillance at the gas station. DEA members never saw the brown paper bag exit the Mazda minivan during this stop.

46. DEA members then saw Martinez get back into his Mazda minivan and drive to **Sosa-Hernandez's residence**. DEA members had Martinez under constant surveillance until he arrived at **Sosa-Hernandez's residence**.

47. When he arrived at **Sosa-Hernandez's residence**, Martinez beeped the horn then got out of the minivan and knocked on the front door. After knocking on the door, Martinez returned to the driver's seat of the minivan. Sosa-Hernandez exited his residence and approached the minivan.

48. As Sosa-Hernandez approached the minivan, law enforcement personnel approached the

minivan and placed Martinez and Sosa-Hernandez into handcuffs. When they detained Martinez and Sosa-Hernandez, law enforcement personnel detected the odor of marijuana emanating from the minivan. Law enforcement personnel also observed a brown paper bag between the seats in the middle row of the Mazda minivan.

49. Law enforcement officers utilized a K-9 trained to detect narcotics at the vehicle, and the K-9 signaled for the presence of narcotics. Law enforcement personnel then seized the brown paper bag from the vehicle. The brown paper bag contained a white powder-like substance, which field-tested positive for cocaine.

50. Law enforcement searched Sosa-Hernandez and Martinez, which resulted in the seizure of Target Devices 1, 2, and 3. Law enforcement personnel placed a telephone call into Target Device 1, which illuminated the screen of Target Device 1.

51. Law enforcement personnel advised Sosa-Hernandez of his rights per *Miranda* in Spanish. Law enforcement presented Sosa-Hernandez with a waiver of rights form that is written in Spanish. Sosa-Hernandez read his rights out oud in Spanish, then agreed to waive his rights and speak with law enforcement.

52. Sosa-Hernandez told DEA members, in Spanish, that he would go to Bridgeport two to three times a week with Martinez to see a mechanic.  Sosa-Hernandez stated he received $200-$300 every time he went to Bridgeport with Martinez.

53. A DEA member told Sosa-Hernandez that they saw him receive packages containing cocaine, and he nodded his head indicating "yes." A DEA member asked Sosa-Hernandez how much was in the packages he received, and Sosa-Hernandez said he did not know.

54. DEA members also executed the search warrants at **Sosa-Hernandez's residence** and **Martinez's residence**.

55. DEA members found a firearm, a small amount of a powdery substance that field-tested positive for cocaine, cutting agents, blenders with residue, digital scales, and brown paper bags inside of **Martinez's residence**. In my training and experience, these items are consistent with narcotics trafficking.

56. Based upon the foregoing, there is probable cause to believe, and I do believe, that Martinez and Sosa-Hernandez committed violations of Title 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) and that there is probable cause to believe that electronically stored information described herein and in the attachment hereto is recorded on the Target Devices and constitutes evidence, fruits and/or instrumentalities of these offenses.

57. Based on my training and experience, and consultation with, and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

    a.  the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

    b.  call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

    c.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

d.  records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.  information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said device/s; and,

h.  internet browsing history, to include, internet searches in the memory of said device/s.

## TECHNICAL TERMS

58.     Based on my training and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I use the following technical terms to convey the following meanings:

59.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

60.     Based on my training and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know that the Target Device possess some of the capabilities associated with wireless telephones, as listed above.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

61.     Based on my knowledge, training, and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

62.     As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Device was

used, the purpose of its use, who used it, and when.  There is probable cause to believe that this

forensic electronic evidence might be on the Target Device because:

  a. Data on the storage medium can provide evidence of a file that was once on the

    storage medium but has since been deleted or edited, or of a deleted portion of a

    file (such as a paragraph that has been deleted from a word processing file).

  b. Forensic evidence on a device can also indicate who has used or controlled the

    device.  This "user attribution" evidence is analogous to the search for "indicia of

    occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may,

    after examining this forensic evidence in its proper context, be able to draw

    conclusions about how electronic devices were used, the purpose of their use, who

    used them, and when.

  d. The process of identifying the exact electronically stored information on a storage

    medium that are necessary to draw an accurate conclusion is a dynamic process.

    Electronic evidence is not always data that can be merely reviewed by a review

    team and passed along to investigators.  Whether data stored on a computer is

    evidence may depend on other information stored on the computer and the

    application of knowledge about how a computer behaves.  Therefore, contextual

    information necessary to understand other evidence also falls within the scope of

    the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who

    used it, and when, sometimes it is necessary to establish that a particular thing is

    not present on a storage medium.

## NATURE OF EXAMINATION AND MANNER OF EXECUTION

63.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.  Based on the above, there is probable cause to believe, and I do believe, that the Target Device contains stored electronic information, including telephone numbers, digits, names, text messages, photographs, videos, identifying information such as telephone numbers and serial numbers, the originating telephone numbers, and other electronic information as outlined in Attachment B, that will assist law enforcement in this investigation and which is evidence of the violations of the above.

64.     Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

Respectfully submitted,

John Binkowski
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on this 22 day of April 2019

/s/

Hon. Holly B. Fitzsimmons
United States Magistrate Judge

<u>**ATTACHMENT A**</u>

**TARGET DEVICE:**

    a.  **Target Device 2:** Samsung smart phone, which utilized number (475) 449-4333; IMSI: 310260071226404; which is currently in DEA custody.

## ATTACHMENT B

The items to be seized include:

All stored electronic information concerning violations of Title 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(C), including telephone numbers, digits, names, text messages, photographs, videos, identifying information such as telephone numbers and serial numbers, the originating telephone numbers and other electronic information stored in the TARGET DEVICE 2, including:

A.  the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

B.  call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

C.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

D.  records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

E.  information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

F.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

G.  saved searches, locations, and route history in the memory of said device/s; and,

H.  internet browsing history, to include, internet searches in the memory of said device/s.